## In the Matter of Stella B. Angwafo.

Suffolk. November 5, 2008. - January 9, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, & Botsford, JJ.

*Attorney at Law,* Disciplinary proceeding, Suspension.

Evidence presented at a bar disciplinary proceeding was not sufficient to support a finding that the respondent, in making certain representations in Probate and Family Court proceedings regarding her financial assets, knowingly made false statements of material fact, and while sufficient evidence existed to support a finding that the respondent had falsely represented her marital status, her prompt remedial measures, taken once she had been alerted to the issue, precluded a conclusion that she had violated the Rules of Professional Conduct [34-37]; however, the hearing officer was warranted in concluding that the respondent, by displaying a persistent pattern of stating contradictory facts in a manner that would be advantageous to her, engaged in conduct that was deceitful and adversely reflected on her fitness to practice law [37].

In a bar discipline case, this court concluded that a one-month suspension from the practice of law and a required course in professional responsibility was the appropriate sanction to be imposed on a respondent who, by displaying a persistent pattern of stating contradictory facts in a financial statement filed in Probate and Family Court proceedings, had engaged in conduct that was deceitful and adversely reflected on her fitness to practice, in light of the compelling mitigating circumstances, i.e., that the respondent had prepared the financial statement in court while experiencing fear and stress, given that she was placed in close proximity to the father of her child, who was the subject of a protective order that she sought following a frightening and grave incident of abuse. [37-39]

Information filed in the Supreme Judicial Court for the county of Suffolk on January 9, 2008.

The case was reported by *Greaney,* J.

*John W. Marshall,* First Assistant Bar Counsel.

*Martin R. Rosenthal* for the respondent.

Spina, J. Bar counsel filed a petition for discipline alleging that Stella B. Angwafo, the respondent, intentionally misrepresented the amount of her assets on her personal financial statement filed in the Probate and Family Court, and that she inten-

tionally misrepresented her marital status in a motion for child support and continued health insurance coverage for her child and herself. After an evidentiary hearing, a special hearing officer found that the respondent made intentional misrepresentations to the Probate and Family Court by (1) misrepresenting on her financial statement that she had no bank accounts when in fact she did; and (2) misrepresenting in a motion for child support and continued health insurance coverage that she was married when in fact she was not. The special hearing officer found, in mitigation, that at the time the respondent misrepresented her assets she experienced fear and stress as a result of domestic abuse. He recommended that she be suspended from the practice of law for two months.

The respondent appealed to the Board of Bar Overseers (board). The board adopted the special hearing officer's findings of fact and conclusions of law, but concluded the special hearing officer had "vastly understate[d]" the type of stress experienced by the respondent at the time she completed the financial statement in question. The special hearing officer had compared it to the stress of practicing law. The board noted that the stress associated with the practice of law is "typical," and entitled to little weight in the determination of a sanction, see *Matter of Alter*, 389 Mass. 153, 156-157 (1983), but concluded that there was nothing "typical" about the fear and stress felt by the respondent. When she filled out her financial statement the respondent was sitting beside the man who was the father of her three year old son and who recently had driven his Toyota Land Cruiser into the driver's side of her Toyota Camry sedan while she and her son were inside. The board assessed her fear as "understandable terror," "transcend-[ing] 'typical' mitigation," and recommended a public reprimand.

1. *Facts*. The board found the following facts, which we supplement with undisputed evidence in the record. See *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007), and cases cited.

The respondent was born in Cameroon in 1966. She came to the United States in 1987 and attended Texas Southern University on a student visa. She earned her bachelor's degree in 1990 and a master's degree in 1992, both at Texas Southern University. While she was a student, she met Anthony Dwayne Solomon,

whom she married in 1991. Solomon, a United States citizen, successfully filed a petition for an alien relative (green card) on her behalf. They separated in 1993.

In 1994, the respondent met George Taboh, who also was from Cameroon. They began a relationship that led to his proposal of marriage. He asked her to come to Massachusetts and live with him. She acceded to his request on condition that they go through a tribal rite of marriage in Cameroon. The tribal rite was performed in Cameroon in April, 1995. They lived together thereafter in Framingham. She filed for divorce from Anthony Solomon in January, 1998. The divorce became final on July 15, 1998.

Friction between Taboh and the respondent developed early. She was pursuing a law degree, and he wanted her to stay home and have children. He was physically and emotionally abusive toward her. She agreed to become pregnant in hope that his abuse would end. While she was pregnant, she was diagnosed with a brain tumor. The beatings persisted, and his girl friends would telephone the house late at night. She left law school in the spring of 1998 to give birth to her son, who was born in April. She returned to law school that fall, and earned her degree in December, 1998. The respondent became a member of the bar on December 13, 1999, and began a solo practice of law in early 2000. At about the same time she opened her own agency for temporary employees. Approximately ninety per cent of her law practice has been criminal defense work and the balance has been general, including some domestic relations cases.

In May, 2001, Taboh went to Cameroon to attend the funeral of his brother. The respondent moved out of their apartment while he was away. She did not want him to know where she lived. When he returned, he was upset to find her and their son gone. On June 13, after she picked up their son from day care, he followed her to discover where she was living. He drove his vehicle into her car while she and her son were inside. He was arrested and charged with two counts of assault and battery by means of a dangerous weapon and one count of negligent operation of a motor vehicle. Police advised her to apply for a protective order. Taboh subsequently admitted to sufficient facts to warrant a finding of guilty.

On June 19, 2001, the respondent executed a home construction agreement toward which she had paid a $2,000 deposit on April 21. At the time of signing she paid a further deposit of $14,635 toward the purchase price of $332,702. On July 9, she applied for a mortgage, reporting that she was unmarried,[1] that her gross income was $14,598 a month, and that her assets consisted of three specific bank accounts totalling $48,000 and a car worth $3,500. The application was prepared by a mortgage broker based on documents and information provided by the respondent, and it contained a certification by the respondent that the facts offered in support of the application were true.

On July 13, 2001, the respondent applied for and received from the Probate and Family Court an ex parte temporary protective order under G. L. c. 209A against George Taboh. She reported in the complaint that she and Taboh were married, and that they had a child. The respondent requested temporary custody of their child, which she also received, and an order for support for the child, which she did not receive. She did not request support for herself. The case was continued to July 27 for a hearing to determine whether the orders should be extended.

On July 27, 2001, George Taboh appeared in court. On that day a family service officer asked both the respondent and Taboh to complete financial statement forms for the judge's consideration of the question of child support. That was the first time the respondent had seen Taboh since he assaulted her with his car on June 13. She tried to avoid him, but the family service officer directed them to the same area to complete the forms. The respondent sat about five feet away from Taboh as they prepared their respective financial statements. She was very nervous and fearful of Taboh.

Specific instructions at the beginning of the form state: "All questions on both sides of this form must be answered in full or the word 'none' inserted." The respondent had not gone to court expecting to file a financial statement and she did not have any documentation with necessary information. The respondent placed an estimated number, or a zero, on nearly every line of the form.

---

[1]The special hearing officer found that the respondent filed her 2000 and 2001 Federal income tax returns (prepared by a third party) as an "unmarried head of household."

Relevant to this appeal, she reported that her gross and net weekly income was $600[2]; she placed nothing on line 10(e), which requested information as to "Savings & Checking Accounts, Money Market Accounts, and CDs"[3]; and she reported that her car was worth $2,000 (her July 9 mortgage application listed the car as having a value of $3,500). She also left line 10(h) blank, which called for "Total Assets." The financial statement form contains the following certification, which the respondent signed: "I certify under the penalties of perjury that my income and expenses, assets, and liabilities as stated herein are true to the best of my knowledge and belief. I have carefully read this financial statement and I certify the information is true and complete." After a hearing, the order of July 13 was extended six months, to January 23, 2002, as modified by a stipulation of the parties as to visitation.

On August 9, 2001, the respondent filed with the Probate and Family Court a petition for custody of her son, pursuant to G. L. c. 209, § 37. She stated therein that she was the lawful wife of George Taboh. Simultaneously therewith she filed a motion for an order of support of her son, and for an order that Taboh reinstate and maintain his medical and dental insurance policies for the benefit of their minor child and for herself. She further sought an order that she and Taboh each pay fifty per cent of their son's uninsured medical and dental expenses, and that Taboh be granted reasonable visitation with their son. The respondent filed a supporting affidavit in which she stated that she and Taboh were married in May, 1995, and that she was covered under Taboh's family health insurance policy with his employer from January, 1999, until June 30, 2001, when he terminated coverage for her.

A hearing on the respondent's motion was scheduled for August 17, 2001. Taboh, who was out of the area, was represented by counsel. Taboh's counsel argued that the parties were not legally married. The judge indicated that at least as to child sup-

---

[2]The respondent did not include a Schedule A, as required, detailing her gross weekly income from self employment and allowable deductions for expenses. See Mass. Dom. Rel. P. Form CJ-D 301A. She did not have any relevant documents with her that might be needed to complete such a detailed form.

[3]On July 27, 2001, her three bank accounts contained a total of $33,255.30.

port and insurance for the child, marriage was irrelevant. The judge continued the case one week, awarded physical custody of the child to the respondent, and ordered Taboh to maintain medical and dental insurance for the respondent and their child. Immediately after the hearing, as a result of Taboh's challenge to the respondent's claim that they were married, the respondent and Taboh's counsel agreed to dismiss the proceeding under G. L. c. 209, § 37, and proceed with a paternity action under G. L. c. 209C.

On August 23, 2001, the parties appeared for the scheduled continuance of the hearing in the G. L. c. 209, § 37, case, except that the case had been dismissed, and the parties went forward on a paternity action with a new docket number. The parties filed a stipulation (1) of paternity; (2) that the parties would have joint legal custody of their child and the respondent would have physical custody; (3) that Taboh would provide health insurance for their child, and the parties would share equally the cost of uninsured medical expenses; and (4) that Taboh would enjoy visitation with their child according to a highly detailed schedule. The case proceeded to a hearing as to the issue of child support, but the judge declined to proceed because the financial statements of July 27 were not complete. Relevant to this appeal was the absence of any information as to the respondent's bank accounts.

On August 30, 2001, the respondent retained counsel, who advised her to hire an accountant. On September 25, the parties, both represented by counsel, returned to the Probate and Family Court on the question of child support. Both parties filed new financial statements. The respondent's financial statement, prepared with the assistance of an accountant, listed her total gross weekly income as $1,255.94 and her total adjusted net weekly income as $890.91 for her law practice and her business.[4] She listed three bank accounts totalling $9,310.21, a motor vehicle worth $5,700, and an $18,423 deposit on a house (added in handwriting to the typed form). After a hearing, George Taboh was ordered to pay $110 per week for child support, retroactive to August 23.

---

[4]The respondent's 2001 Federal tax return shows a total adjusted gross income of $33,943, or $652.75 per week. Her 2000 Federal tax return shows a total adjusted gross income of $5,540, or $106.54 per week.

The board concluded that the respondent violated Mass. R. Prof. C. 3.3 (a) (1) and (4), 426 Mass. 1383 (1998), and Mass. R. Prof. C. 8.4 (c), (d), and (h), 426 Mass. 1429 (1998).[5]

2. *Discussion.* Subsidiary facts found by the board will be upheld if supported by substantial evidence. See S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1309 (1997). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). The special hearing officer is the sole judge in matters involving a determination of credibility. See S.J.C. Rule 4:01, § 8 (4). See also *Matter of Saab*, 406 Mass. 315, 328 (1989). His credibility determinations will be upheld unless it can be " 'said with certainty' that [a] finding was 'wholly inconsistent with another implicit finding.' " *Matter of Barrett*, 447 Mass. 453, 460 (2006), quoting *Matter of Hachey*, 11 Mass. Att'y Discipline Rep. 102, 103 (1995). The conclusions and recommendations of the board are entitled to great weight, but we are not bound by them. *Matter of Fordham*, 423 Mass. 481, 487 (1996), cert. denied, 519 U.S. 1149 (1997). We may reach our own conclusions. *Matter of Anderson*, 416 Mass. 521, 525 (1993).

We first address the question whether the respondent "knowingly" made a "false statement of material fact . . . to a tribunal." Mass. R. Prof. C. 3.3 (a) (1). The petition for discipline alleged that she misrepresented the value of her assets on the financial statement of July 27, 2001, and that she misrepresented her marital status.

A lawyer's knowledge that a statement is false may be inferred from the circumstances. Restatement (Third) of the Law Governing Lawyers § 120 comment c (2000). Generally, a false state-

---

[5]Rule 3.3 (a) (1) and (4) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1383 (1998), states: "(a) A lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal . . . (4) offer evidence that the lawyer knows to be false, except as provided in Rule 3.3 (e). If a lawyer has offered . . . material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures."

Rule 8.4 (c), (d), and (h) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1429 (1998), states: "It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice; . . . (h) engage in any other conduct that adversely reflects on his or her fitness to practice law."

ment is an assertion of fact that is not true. See *Kilroy* v. *Barron*, 326 Mass. 464, 465 (1950). Cf. *Swinton* v. *Whitinsville Sav. Bank*, 311 Mass. 677, 678-679 (1942). Because this disciplinary rule shares many elements with perjury, see Restatement (Third) of the Law Governing Lawyers, *supra* at § 120 comments d and f, the false statement must be "susceptible of a reasonably ascertainable meaning," or reasonably free of ambiguity. *Commonwealth* v. *Giles*, 353 Mass. 1, 15 (1967). Silence can be tantamount to a false statement where there is a duty to speak. See *Greenery Rehabilitation Group, Inc.* v. *Antaramian*, 36 Mass. App. Ct. 73, 78 (1994); *Sierra Glass & Mirror* v. *Viking Indus., Inc.*, 107 Nev. 119, 126-127 (1991) (attorney referred to discipline board for omitting portion of deposition when reading it into record, leaving impression that full text was being proffered). See also *Matter of Neitlich*, 413 Mass. 416, 423 (1992) ("ABA Standards for Imposing Lawyer Sanctions recommend . . . disbarment where an attorney, with intent to deceive a court, makes a false statement or 'improperly withholds material information' ").

In the context of rule 3.3 (a) (1), a fact is material if, viewed objectively, it directly or circumstantially had a reasonable and natural tendency to influence a judge's determination. Unlike common-law fraud, and similar to perjury, reliance and actual harm are not elements of bar counsel's proof. It is not necessary to show that the statement of material fact did in fact influence a determination by the judge. See *Commonwealth* v. *Giles*, 350 Mass. 102, 111 (1966), *S.C.*, 353 Mass. 1 (1967), overruled on other grounds, *Commonwealth* v. *McDuffee*, 379 Mass. 353 (1979); *Matter of Goodman*, 22 Mass. Att'y Discipline Rep. 357, 366 (2006).

The July 27 financial statement is silent as to the respondent's bank accounts, and it is silent as to the amount of her "Total Assets." Because they are not statements of fact, these omissions cannot be said to be false unless the respondent had a duty to provide the information. The form required her to fill in all the blanks, and she certified under the penalties of perjury that her financial statement was "true and complete" to the best of her knowledge and belief. However, where the respondent listed her car among her assets ($2,000) but provided no figure on the

"Total Assets" line, and where immediately below this she listed her liabilities together with an amount for her total liabilities, the absence of any figure for "Total Assets," especially the figure $2,000 for her car, amounts to an ambiguity. Had she stated that her "Total Assets" were $2,000, we would have no trouble concluding that the omission of any information about her bank accounts was a false statement. As the evidence here stands, it is equally plausible to conclude that the financial statement simply was incomplete as it was false. We conclude that the evidence is not sufficient to warrant a finding that the respondent falsely stated her assets.

With respect to the value of the automobile, a ten year old (1992) Toyota Camry that had been in an accident two weeks before the respondent reported its value as $2,000, there is little to indicate this statement was false other than that its value was reported as $3,500 on the respondent's mortgage application two and one-half weeks earlier. There are many ways to value a car, including loan value, trade-in value, and fair market value. More significantly, there is nothing to indicate the difference in value was material to any issue in the case. That is, there is no basis to conclude that a judge would have entered a different child support order because of a $1,500 variation in the value of an old car.

The respondent's statement that she was married to Taboh is false. Taboh appears to have been aware that the respondent was married to Solomon at the time they went through a tribal marriage ceremony in Cameroon. Taboh's knowledge would render the second marriage void, not merely voidable, under Massachusetts law. See G. L. c. 207, § 6. The special hearing officer properly attributed knowledge of the law to the respondent. The materiality of the statement is apparent, where she was seeking continued health and dental insurance coverage for herself as Taboh's wife under his employer's group policies.

When Taboh raised the issue of nonmarriage, the respondent promptly withdrew her claim of support and insurance coverage, agreed to dismiss her action under G. L. c. 209, § 37, and proceeded only under G. L. c. 209C, to establish paternity and support for their child. We conclude that the board's finding that the respondent violated rule 3.3 (a) (1) as to her marital

status is supported by substantial evidence. However, her decision to dismiss the proceeding under G. L. c. 209, § 37, was prompt, and violation of rule 3.3 (a) (4) will not lie.

We turn to the findings and conclusions that the respondent violated rule 8.4 (c), (d), and (h). The hearing officer found that the respondent "displayed a persistent pattern of stating contradictory facts so that the facts, in the particular instance in which she set them out, would be advantageous to her. Thus, she states she is unmarried and marshals assets when she desires to obtain a mortgage loan; but she states, under oath, that she is married [and] has virtually no assets . . . when she is seeking support and health insurance." This finding is supported by substantial evidence. The respondent testified that, when she prepared the July 27, 2001, financial statement, she knew she had various bank accounts, but because she did not know how much was in each account, she omitted all information as to her accounts. By contrast, although she did not know the exact balance on her school loans, she listed each by creditor and provided an estimate as to the amount owed on each. She could have treated her assets precisely as she treated her liabilities, but elected not to do so. Although we have concluded the evidence does not support a finding that the respondent knowingly made a false statement of material fact as to her assets, the special hearing officer properly could conclude on this record that the respondent's conduct was deceitful, and adversely reflected on her fitness to practice law in violation of rule 8.4 (c), (d), and (h).

3. *Sanction.* When deciding what sanction is appropriate we look to the discipline imposed in comparable cases. See *Matter of Saab*, 406 Mass. 315, 325 (1989).

We begin by acknowledging with approval that the special hearing officer and the board did not weigh heavily against the respondent her false statement that she was married. The special hearing officer found that the respondent "reasonably could think of herself as married by reason of the tribal ceremony in Cameroon," especially after six years of "marriage" with Taboh, although as a lawyer, he concluded, she should have known otherwise. We focus on the violations of rule 8.4 (c), (d), and (h), which comprise the gravamen of the misconduct.

In *Matter of Neitlich*, 413 Mass. 416, 422 (1992), we con-

cluded that a one-year suspension was appropriate for a lawyer who "perpetrate[d] a fraud on the court and opposing counsel" by "actively mispresent[ing]" that a "purchase and sale agreement pertaining to personalty did not exist," and after being called on to disclose the terms of the sale, he "deliberately concealed the existence of the second agreement." In that case, not only did the lawyer knowingly make a false statement of material fact, but his misconduct was "active," "deliberate," and "planned." *Id.* at 420. A similar case is *Matter of McCarthy*, 416 Mass. 423 (1993). The present case involves neither a false statement (other than as to marriage) nor the level of planning and persistent misconduct seen in those cases.

In *Matter of Finnerty*, 418 Mass. 821 (1994), we imposed a six-month suspension for misrepresentation on a lawyer's personal financial statement in his own divorce action. He was found to have violated the predecessors of the rule, precisely the same violations as occurred here. As here, *Matter of Finnerty*, *supra*, involved no finding that the lawyer knowingly made a false statement of material fact. It is comparable in some respects to the instant case, although the misconduct here is far less egregious than there. We note that the general tenor of the respondent's misconduct was not comparable to the complex conniving seen in *Matter of Finnerty*, *supra*; and the primary thrust of her legal actions was support and maintenance for her child. A suspension is called for here, but less than six months.

The mitigating circumstances here are very powerful. The respondent had been subject to what the special hearing officer and the board found was a "frightening and grave incident of abuse" on June 13, 2001, following nearly six years of physical and emotional abuse. At the time the respondent prepared her financial statement of July 27, a family service officer of the Probate and Family Court directed the respondent and Taboh to the same area. This should not have happened. We find this particularly disturbing, and agree with both the special hearing officer and the board that she was under considerable stress and fear while preparing the financial statement, placed about five feet away from her abuser by the very court from whom she sought protection.

Nevertheless, we cannot overlook the fact that the respondent

had enough presence of mind to itemize her school loans and provide a total of liabilities, while providing utterly no information as to her bank accounts. She was aware of the existence of her accounts and she at least could have mentioned the names of the banks, and perhaps placed a question mark after each name. Instead, she omitted all reference to them. Although the respondent was, in effect, exposed to her abuser at precisely the time she was preparing her financial statement, she provided all the requested information except as to her bank accounts. The special hearing officer wrestled with this. In the final analysis he recommended a two-month suspension because he found that the respondent's financial statement was more the product of her intentionality than of her carelessness, fear, or stress. We accept this finding.

We recognize the compelling mitigating circumstances in this case, and we have given great weight to the recommendation of the board. However, "[a]lthough the effect upon the respondent lawyer in any discipline case is an important consideration, the primary factor is the effect upon, and perception of, the public and the bar." *Matter of Alter*, 389 Mass. 153, 156 (1983), citing *Matter of Keenan*, 314 Mass. 544, 547 (1943). "An effective judicial system depends on the honesty and integrity of lawyers who appear before their tribunals." *Matter of Finnerty*, *supra* at 829, citing *Matter of Mahlowitz*, 1 Mass. Att'y Discipline Rep. 189, 192-194 (1979). We conclude that the respondent should be suspended from the practice of law for one month, and that she be required to take (and pass) a course in professional responsibility within the next eighteen months.

*So ordered.*